**Dennis PATTERSON, Plaintiff–Appellant,**

v.

**ILLINOIS DEPARTMENT OF CORRECTIONS, Defendant–Appellee.**

**No. 01–3456.**

United States Court of Appeals, Seventh Circuit.

Argued April 24, 2002.

Decided June 13, 2002.

Before COFFEY, KANNE, and EVANS, Circuit Judges.

ORDER

Dennis Patterson worked as a correctional officer for the Illinois Department of Corrections (IDOC) at Hill Correctional Center in Galesburg, Illinois. In 1995 Patterson refused to undergo a mandatory tuberculosis test, and IDOC fired him. Patterson subsequently brought this action under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, alleging that IDOC discriminated against him based on disability. The district court granted IDOC's motion for summary judgment, and Patterson appeals. We affirm.

I. Background

Dennis Patterson began working for IDOC in 1990. As part of a pre-employment medical assessment, he underwent a tuberculosis skin test. Patterson's results were negative, and he suffered no adverse reaction to the test.

In 1992, as part of an annual screening, Patterson took a tuberculosis skin test

called a "Mantoux test."[1] Patterson's results were negative, but, shortly after the test was administered, he experienced weakness, dizziness, disorientation, aches in the arm and shoulder, and labored breathing. He was taken to the emergency room. Medical personnel assumed that Patterson's episode was related to the Mantoux test, even though Patterson's symptoms were not typical of an allergic reaction. Medical records reveal that Patterson had a slightly low glucose level on the day he was tested.

At the annual screening in 1993, Patterson stated on a health questionnaire that he had reacted positively to a prior tuberculosis skin test. After speaking with health care personnel, however, Patterson changed his questionnaire response to state that he had suffered an allergic reaction to the test. Patterson's personal physician advised him not to take the Mantoux test again. In 1993 and 1994, therefore, Patterson submitted chest x-rays in lieu of undergoing the Mantoux test. Patterson's chest x-rays during those years did not reveal active tuberculosis, but showed some "chronic fibrotic changes"[2] in both lungs.

In April 1995, IDOC required Mantoux testing for all employees who had not previously tested positive. Patterson refused a direct order by Assistant Warden Dillman to submit to the Mantoux test and was suspended from work for ten days. Patterson filed a grievance with his union, which arranged for him to be seen by an independent medical professional at IDOC's expense.

Patterson was subsequently examined by Dr. Donald Graham, a specialist in infectious diseases, who concluded that Patterson would not likely suffer adverse reactions to future Mantoux tests. Dr. Graham stated that Patterson's symptoms were more characteristic of a "hyperventilation reaction" than an allergic reaction. Dr. Graham did recommend, however, that any future Mantoux test be administered in a hospital setting with a Heparin lock.[3] He also acknowledged several alternatives to the Mantoux test, including a tine test or a prophylactic course of Isoniazid, ordinarily prescribed to those who test positive for tuberculosis exposure. Serial chest x-rays would be a last resort, Dr. Graham noted, because x-rays can detect active tuberculosis but not exposure to or early onset of the disease.

After reviewing Dr. Graham's report, IDOC demanded that Patterson take the Mantoux test or be fired. Patterson refused and, in a written "request for accommodation" that he hand delivered to Warden Jerry Gilmore, asked IDOC to accept a chest x-ray in lieu of the Mantoux test. According to Patterson, Warden Gilmore responded by calling Patterson "a kind of a troublemaker" and asserting that "people like [Patterson] cause a lot of problems." IDOC subsequently dismissed Patterson for refusing to submit to the Mantoux test.

1. Several tests for tuberculosis are available: the Mantoux test; other skin tests which, like the Mantoux test, use a purified protein derivative (PPD); and the tine test, which involves puncturing the skin with a four-pronged apparatus. The Mantoux test is considered the most accurate testing method for tuberculosis. CLINICAL LABORATORY TESTS 616 (Fandek et. al. eds., 1995). The exact type of tuberculosis skin test administered to Patterson when he first joined IDOC in 1990 is unknown.

2. Fibroid tissue forms in an organ as a reparative or reactive process and can have many different causes. Stedman's Medical Dictionary 671 (27th ed.1999).

3. Heparin is an anti-coagulant, which prevents blood clotting.

Patterson filed suit in district court, alleging that the condition that caused his adverse reaction to the 1992 tuberculosis test was a disability and that, by firing him, IDOC discriminated against him in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

The district court found that Patterson's sensitivity to the Mantoux test did not qualify as an actual disability under either the Rehabilitation Act or the ADA. The court reasoned that an allergy to a tuberculosis skin test did not substantially limit Patterson's ability to function as a correctional officer or preclude him from working in a class of jobs or a broad range of jobs in various classes. The court therefore dismissed the Rehabilitation Act and ADA claims that relied upon a theory of actual discrimination. Patterson's remaining ADA claims were dismissed on Eleventh Amendment sovereign immunity grounds. The court also struck Patterson's punitive damages request, finding that section 504 of the Rehabilitation Act did not allow such a remedy. The court concluded, however, that Patterson's allegations were sufficient to support his claims that he was disabled because he had a "record of" and a "perceived" disability. Patterson, therefore, was allowed to proceed under the Rehabilitation Act based on the theory that IDOC discriminated against him because of his record of disability and its perception that he was disabled.

After further discovery and briefing, IDOC moved for summary judgment on Patterson's remaining Rehabilitation Act claims, and the district court entered judgment in IDOC's favor. The court ruled that, because Patterson's sensitivity to the Mantoux test was not an actual disability, Patterson's adverse reaction to the test did not constitute a record of a disability. The court further noted that Patterson continued to work without restrictions for years after suffering the adverse reaction. Accordingly, the court concluded, a reasonable jury could not find that IDOC considered Patterson to be disabled.

## II. Analysis

We review a district court's grant of summary judgment de novo, drawing all inferences in the light most favorable to the party opposing summary judgment. *Winfrey v. City of Chicago*, 259 F.3d 610, 614 (7th Cir.2001). Summary judgment is appropriate only if the record reflects no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.*

Patterson submits that his dismissal from IDOC constituted discrimination on the basis of disability in violation of section 504 of the Rehabilitation Act. To merit relief under the Rehabilitation Act, Patterson must first establish that he is an individual with a disability. *See Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir.2000). For the purposes of the Rehabilitation Act, an "individual with a disability" is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B); *see also Sanchez v. Henderson*, 188 F.3d 740, 744 (7th Cir.1999). Patterson does not challenge the district court's finding that he meets neither of the test's first two prongs.

Instead, Patterson zeroes in on the test's third prong and argues that he established disability by presenting evidence that IDOC "regarded" him as impaired, and terminated him on that basis. A plaintiff may demonstrate that an employer regarded or perceived him as impaired

by showing that "1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or 2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Airlines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Relying on the second approach, Patterson argues that his "actual, nonlimiting impairment" is his sensitivity to the Mantoux test. To prevail on this argument, then, Patterson must establish IDOC's belief that his sensitivity to the Mantoux test impaired his ability to perform the major life activity of working.

Patterson suggests that IDOC terminated him based on fear of contagion and analogizes his case to *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In *Arline,* the Supreme Court held that a schoolteacher afflicted with contagious tuberculosis was a "handicapped individual" within the meaning of the Rehabilitation Act, prohibiting discrimination against handicapped individuals solely by reason of their handicap. *Id.* at 284–85, 288, 107 S.Ct. 1123. In reaching this conclusion, the Court found that the teacher's recurrent tuberculosis constituted a disability, and the school board's fear that her tuberculosis was contagious, by itself, was not sufficient reason to terminate her. Patterson's situation is not at all comparable to *Arline* because, unlike Arline, Patterson does not suffer from an actual disability. While Arline's chronic tuberculosis was severe enough to require hospitalization, nothing in the record suggests that Patterson ever suffered tuberculosis or even experienced a positive reaction to a tuberculosis test.

Patterson also contends that IDOC's mandatory Mantoux testing is an impermissible "blanket policy" or "100% rule",

which, in the context of disability law, means that the testing is automatically and improperly required of all disabled workers without any individualized assessment. *See, e.g., Hutchinson v. United Parcel Serv.,* 883 F.Supp. 379, 396–97 (N.D.Iowa 1995) (impermissible policy summarily prohibited all injured employees from returning to work until they were "100% healed"); *Sarsycki v. United Parcel Serv.,* 862 F.Supp. 336, 341–42 (W.D.Okla.1994) (impermissible policy prohibited all insulin dependent diabetics from working as drivers without individualized assessment of their qualifications). IDOC's tuberculosis testing requirement is a blanket policy, Patterson asserts, because it requires all employees to take the Mantoux test and does not allow the alternative of chest x-rays for individuals like himself who have reacted adversely to the test in the past. In all the cases that Patterson cites to support his "blanket policy" claim, however, the policy at issue was applied only to a group of workers already identified as disabled. *Hutchinson,* 883 F.Supp. at 396–97; *Sarsycki,* 862 F.Supp. at 341–42. In other words, the "blanket" did not cover *all* employees, but only those employees who were disabled. *See Henderson v. Ardco,* 247 F.3d 645, 653 (6th Cir.2001) ("All courts that have examined the question ... agree that a 100% rule is impermissible as to a disabled person—but one must first be disabled."). The tuberculosis testing requirement to which Patterson objects applies to *all* correctional officers at Hill Correctional Center—not only those identified as disabled—and therefore does not constitute an impermissible blanket policy.

As further evidence that IDOC perceived him as disabled, Patterson points to an exchange in which Warden Gilmore called him a "troublemaker" and made a reference to "people like [Patterson]." According to Patterson, such comments can be interpreted only as disparaging state-

ments about the class of "individual[s] with a disability presenting a request for accommodation." Nothing in the terms "troublemaker" or "people like [Patterson]" suggests that Warden Gilmore, or IDOC, believed Patterson to be disabled, however. Patterson has presented no other evidence upon which to conclude that IDOC believed him to be disabled and acted with discriminatory intent in firing him.

At oral argument, Patterson proposed yet another basis for concluding that IDOC discriminated against him—that IDOC rigidly applied its Mantoux testing requirement to him but relaxed it for another employee. Marlene Guthrie, the Health Care Administrator for Hill Correctional Center, had tested positive for tuberculosis in the past, and, as a result, was not required to take the Mantoux test. According to Patterson, that Guthrie's positive reaction exempted her from the test—while his adverse reaction did not—demonstrates that IDOC subjected him to discrimination. But Patterson did not present this theory in the district court, nor did he brief it on appeal, and we therefore do not consider it. *See Washington v. Indiana High School Athletic Ass'n, Inc.,* 181 F.3d 840, 843 n. 4 (7th Cir.1999).

Because Patterson is not disabled and IDOC does not perceive him to be, his case falls outside the scope of the Rehabilitation Act. Summary judgment was appropriate, and we need not reach the issue of punitive damages.

AFFIRMED.